UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Elaine F. Humphrey,

      Plaintiff,

v.

                                          Civil No. 09-3705 (JNE/FLN)
                                          ORDER

Prudential Insurance
Company of America,

      Defendant.

      Elaine Humphrey brought this action against Prudential Insurance Company of America (Prudential) to recover long-term disability (LTD) benefits under a plan offered by her former employer, KPMG, LLP, pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (2006).  Humphrey also claims that Prudential breached its fiduciary duty. The case is before the Court on Prudential's Motion for Summary Judgment.  For the reasons set forth below, the Court grants Prudential's motion.

## I.      BACKGROUND

      Beginning in July 2005, Humphrey worked for KPMG as a senior administrative assistant.  During her employment, Humphrey enrolled in a disability plan insured by Prudential under Group Contract G-43764-DE (the Plan), an ERISA-governed employee welfare benefit plan.  Humphrey's coverage under the Plan began on August 1, 2005.

## A.      The Disability Plan

      Prudential is the insurer of the Plan and also serves as its claims administrator.  Plan participants are eligible for LTD benefits if they are found to be disabled.  Under the Plan, "you are disabled when Prudential determines" that:

> you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and

1

you have a 20% or more loss in your indexed monthly earnings due to that
sickness or injury.

(Coppola Decl. D0631)  "Regular occupation" is defined as the "occupation you are routinely

performing when your disability begins.  Prudential will look at your occupation as it is normally

performed instead of how the work tasks are performed for a specific employer or at a specific

location."  (*Id.*)  "Material and substantial duties" are duties that are "normally required for the

performance of your regular occupation" and which cannot be reasonably omitted or modified.

(*Id.*)  Prudential may require a claimant to be examined by doctors, other medical practitioners,

or vocational experts of its choice, at Prudential's expense.  (*Id.*)  The Plan also states that benefit

payments may cease on the "date you fail to submit proof of continuing disability satisfactory to

Prudential."  (*Id.* at D0639)  Proof of a claim includes appropriate documentation of the

disabling disorder and proof of the "extent of your disability, including restrictions and

limitations preventing you from performing your regular occupation," among other information.

(*Id.* at D0644)

Under the Plan in effect as of January 2006, Prudential must make a determination about

a participant's initial claim for benefits within 45 days of filing.  (*Id.* at D0662)  If benefits are

denied, the Plan allows for two levels of appeal, each of which must be initiated within 180 days

of the denial.  (*Id.*)  When Humphrey began work with KPMG, she was provided with a copy of

the Plan providing three levels of appeal.  She was never provided with a new, updated, or

amended version of the Plan.  (Humphrey Aff., ¶¶2-3 & Ex. A)

B.      **Treatment and Claims History**

Humphrey discontinued her work at KPMG in June 2006 because of severe back pain eventually diagnosed as two-level disc degenerative changes, early degenerative spondylolisthesis,[1] subarticular stenosis, and a herniated disc.[2]  Humphrey's treating physician, Dr. Steven Sabers, refers to her primary diagnosis variously as two-level disc degenerative changes, two-level disc abnormality, two-level degeneration at the L4-L5 and L5-S1 vertebrae, and two-level disc protrusion.  Humphrey applied to Prudential for Short Term Disability (STD) benefits in June 2006, and Prudential approved her claim, initially providing STD benefits payments through December 3, 2006.  After a termination and appeal, Prudential reinstated Humphrey's STD benefits through December 17, 2006, and granted LTD benefits for a "closed period of time" through March 31, 2007.  The reinstatement was based on a determination by Albert Kowalski, who is employed by Prudential and board certified in internal medicine and occupational medicine.  Based on Humphrey's self-reported sitting intolerance, exacerbation of pain after tying her boot on January 5, 2007, and office-visit notes dated February 15, 2007, from Dr. Sabers, Dr. Kowalski found that Humphrey was impaired and could not engage in sedentary employment "on a regular and sustained basis" from June 21, 2006 to "at least" March 15, 2007.  Dr. Kowalski noted that an Activities of Daily Living form filled out by Humphrey in April 2007

---

[1]      Spondylolisthesis occurs when a vertebra of the lumbar spine slips out of place. As the spine tries to stabilize itself, the joints between the slipped vertebra and adjacent vertebrae can become enlarged, pinching nerves as they exit the spinal column.  Spondylolisthesis is associated with lower back and leg pain.  Nat'l Inst. of Arthritis & Musculoskeletal & Skin Diseases, U.S. Dep't of Health & Human Servs., *Handout on Health: Back Pain* (2010), http://www.niams.nih.gov/Health_Info/Back_Pain/default.asp#2.

[2]      This diagnosis comes from Dr. Richard M. Salib, to whom Humphrey was referred for a surgical consultation in September 2006.  Dr. Salib saw her in both September and October 2006.  In September, Dr. Salib recommended fusion surgery.  In October 2006, after noting improvements that he attributed to rehabilitation, Dr. Salib determined that fusion surgery was not necessary.

showed greater work capacity, and he recommended an independent medical examination (IME) with an orthopedic surgeon to identify Humphrey's current work capacity.

In July 2007, Humphrey appealed the termination of her LTD benefits.  In support, she submitted a magnetic resonance imaging (MRI) scan from June 2007 and a review of the MRI scan by Dr. Sabers.  According to Dr. Sabers, there did not appear to be any "significant change or evolution in the pathology," and Humphrey continued to suffer from two-level disc degenerative changes with associated facet joint degenerative change.  Dr. Sabers recommended medial branch blocks.  Dr. Kowalski reviewed these records and found impairment through June 2007.  Dr. Kowalski suggested monitoring the outcome of the suggested nerve block therapy,[3] reviewing another Activities of Daily Living form in 4-6 weeks, and setting up an IME with an orthopedic surgeon.  Prudential reinstated her benefits effective April 1, 2007.

In November 2007, Humphrey saw Dr. Amir A. Mehbod, a surgeon.  Dr. Mehbod performed a physical examination, and he reviewed X-rays and an MRI scan.  The X-rays revealed L4-L5 degenerative spondylolisthesis, and the MRI scan showed signs of disc degeneration with an annular tear at the L5-S1 vertebrae.  He observed a normal gait but noted that Humphrey reported she could not sit for any period or stand for more than 30 minutes.  He listed Humphrey's current medications: Vicodin, ibuprofen, multivitamins, omega-3, and calcium.  Dr. Mehbod indicated that he would recommend a two-level fusion surgery for

---

[3]     Ultimately, Humphrey declined to treat with nerve block injections based on a previous negative reaction documented in the record.  Initially, Dr. Sabers prescribed and performed two nerve block injections on Humphrey.  The first offered 10-20% relief and the second had little effect.

Humphrey.  Ms. Humphrey was not interested in fusion surgery, however, and so Dr. Mehbod recommended a nonoperative treatment at that time.[4]

Mary Ann DeSantis, a registered nurse employed by Prudential, reviewed Dr. Mehbod's examination and found that it neither "appear[ed] to reflect abnormal exam findings nor current intensity of [treatment with] pain meds/modalities which would prevent performance of some type of work."  Nurse DeSantis concluded that Humphrey appeared to have the capacity to do at least part-time sedentary work and recommended that a physical therapist review her file to determine her capacity.

On December 17, 2007, Dr. Sabers saw Humphrey.  She was experiencing increasing spasms, numbness, tingling, and paresthesias across her lower back.  She was managing her symptoms with stretching, heat, ice, and rest, and was "dead set" against spinal fusion surgery. Noting that Humphrey still had leftover Vicodin prescribed almost a year before, he prescribed non-narcotic ibuprofen and tramadol to treat her pain.

On January 14, 2008, Melissa Hendricks, a physical therapist, reviewed Dr. Mehbod's report; office-visit notes from a September 25, 2007 examination by a neurologist; and the December 17, 2007, report from Dr. Sabers.  Hendricks did not find "significant abnormalities," but she noted that the degenerative changes in Humphrey's back were consistent with her complaints of pain.  Hendricks determined Humphrey's pain symptoms "may allow" part-time work with restrictions of no sitting or standing for more than 30 minutes at a time and intermittent walking throughout the day.  She recommended an IME or Functional Capacity Examination to determine if Humphrey could function at a higher capacity.

---

[4]     During this meeting, Ms. Humphrey asked Dr. Mehbod about two-level disc replacement surgery, a procedure only available in Europe, and he provided her with the names of surgeons she could contact.

Humphrey believed the cold weather caused in an increase in her pain and, in January 2008, she went to Arizona.  While there, she experienced lower levels of pain and increased her level of activity.  She returned to Minnesota in April 2008.  In May 2008, she estimated to Dr. Sabers that she is 40% better in the dry heat of Arizona.  On examination at that time, Dr. Sabers noted "trace weakness" of the left extensor hallucis longus muscle (EHL)[5] but no other obvious weakness in her extremities.  He made no notes on her lower back pain or ability to sit or stand.  Her diagnosis remained the same: two-level disc degeneration.  A bone density study pursued on this visit came back normal.

Upon her return from Arizona, Prudential arranged for Dr. Hadley, an independent, board-certified orthopedic surgeon, to examine Humphrey.  Dr. Hadley reviewed Humphrey's medical records, including reports by Dr. Sabers and Dr. Salib, and conducted a physical examination.  Dr. Hadley's examination of the spine "revealed no palpable spasm or tenderness." In her lower extremities, he found no motor weakness, no evidence of muscle atrophy, and no sensory complaints.  Humphrey stood throughout the interview and "seem[ed] reluctant to sit." She was able to walk on her heels and toes, squat and touch the floor between her knees, and reverse her lumbar lordosis.  Humphrey indicated she could sit for 10 to 15 minutes at a time and stand for no more than 5 or 10 minutes at a time.   According to Dr. Hadley, there is no way to determine the accuracy of these durational limits because they are "entirely subjective."  While complaints of pain associated with prolonged standing or sitting "are consistent with the radiographic diagnosis of multilevel degenerative disc disease," Dr. Hadley's examination did not "support restrictions with sitting, standing, walking, lifting, carrying, pushing, pulling, or reaching."

---

[5]     The EHL is a muscle that extends the great toe and dorsiflexes the foot at the ankle joint. *Mosby's Dictionary of Medicine, Nursing, and Health Professions* 686 (8th ed. 2009).

Prudential terminated Humphrey's benefits effective June 30, 2008.  The claim denial explains that Dr. Hadley's examination confirmed her diagnosis of lumbosacral spondylosis[6] but did not support restrictions on Humphrey's performance of sedentary work as a senior administrative assistant.  The claim denial also noted that Dr. Hadley's examination, which did not show Humphrey suffered from an antalgic gait and positive straight leg raises, showed improvement from previous records.

Humphrey appealed the termination.  She submitted recent medical records and a letter from Dr. Sabers describing her as "very limited in her ability to walk," unable to sit for more than five minutes, and "substantially limited by her discogenic low back pain and, barring fusion surgery, . . . unlikely to return to prolonged sitting."  He therefore considered her to be "disabled from extended sitting in [her] previous occupation."  The chart notes submitted with the appeal indicate that Dr. Sabers had reviewed Dr. Hadley's report; that Dr. Hadley disputes Humphrey's functional restrictions; and that Dr. Sabers agreed with Dr. Hadley that a discography was unnecessary unless Humphrey was considering surgery.  Dr. Sabers made no other comments about Dr. Hadley's report.  The chart notes indicate a 40-minute office visit with Humphrey, 30 minutes of which were spent on "counseling and care coordination."  The notes do not indicate that a physical examination was conducted.  Humphrey also submitted a letter detailing her levels of pain and disability, reporting that she could stand or sit only five to ten minutes at a time and describing her "natural efforts" at rehabilitation, including acupuncture, pool therapy, and yoga.

---

[6]     Spondylosis refers to ankylosis of the vertebrae, meaning the stiffening or fixation of a joint as the result of a disease process.  It is often used to apply to any lesion of the spine of a degenerative nature.  *Stedman's Medical Dictionary* 1678, 90 (27th ed. 2000).

As part of the appeal, Prudential hired Dr. S. Roger Parthasarathy, an independent, board-certified doctor of Physical Medicine and Rehabilitation/Pain Medicine.  Dr. Parthasarathy reviewed numerous medical records from Humphrey's claim file, including her newest submissions and Dr. Hadley's report.  He found that Humphrey had been functionally impaired since July 1, 2008.  Her impairments included dural tension signs with positive Straight Leg Raises on multiple occasions; poor trunk stability and trunk strength in maintaining appropriate spinal core stabilization; and mild left EHL weakness.  Dr. Parthasarathy interpreted the MRI scans on file as showing broad-based disc bulges at L4-L5 with right foraminal narrowing and contact with the exiting L4 nerve and a larger disc bulge at L5-S1 with displacement of the S1 nerve root.  He concluded that the MRI scans were consistent with both the dural tension signs and EHL weakness, as well as with Humphrey's complaints of pain.  He also noted that discogenic and radicular pain can have a significant impact on sitting, standing, and walking tolerances.  Dr. Parthasarathy concluded that Humphrey could perform a sedentary job with the following "accommodations or restrictions:  sitting or standing up to 15 minutes at a time and walking up to 30 minutes at a time with the opportunity to change position from sitting, standing or walking as needed"; "bend occasionally"; "occasionally lift and carry 10 pounds"; and "reaching and use of the upper extremities-no restrictions."

Fran Grunden, a Vocational Rehabilitation Specialist employed by Prudential, reviewed the reasonableness of Dr. Parthasarathy's recommendations in light of the occupational responsibilities of a senior administrative assistant.  Grunden reviewed job descriptions obtained from KPMG, the Occupational Information Network (O*Net),[7] and the Occupational Outlook

---

[7]     O*Net is "a database of occupational requirements and worker attributes.  It describes occupations in terms of the skills and knowledge required, how the work is performed, and

Handbook, 2006-07.[8]  According to KPMG, the duties include assisting with proposals, designing brochures, sending mass mailings, planning events, and arranging meetings.  O*Net stated that executive secretaries and administrative assistants performed a variety of duties, including distributing mail and greeting visitors.  The Occupational Outlook Handbook stated that the job involved long periods of sitting, and a variety of clerical and administrative tasks. Grunden also considered the physical requirements of working as a senior administrative assistant and determined that the position is sedentary because it is performed primarily seated. The physical demands include "continuous sitting," "frequent standing and walking," and "frequent climbing while carrying," among others.  In performing the material and substantial duties of the occupation, Grunden determined that a person would be primarily seated but that the job may involve standing or walking for brief periods, and that the occupation requires frequent reaching, handling, and fingering.  Grunden concluded that Humphrey would be able to work in the occupation as described by KPMG and in the national economy while operating under the limitations outlined by Dr. Parthasarathy because:

> it appears that the occupation would allow for change of position from sit, stand, walk as needed.  The occupation is performed primarily seated, with opportunity for brief periods of standing and walking.  It is reasonable for the occupation to allow for change of position as needed, including brief stand, shift of position, or sit at 15 minute intervals if needed.

Quoting heavily from Dr. Parthasarathy and Grunden's evaluations, Prudential denied Humphrey's first appeal on October 4, 2008.  Humphrey initiated a second appeal, accompanied

typical work settings."  U.S. Dep't of Labor, http://www.doleta.gov/programs/onet/ (last visited May 16, 2011).

[8]      Revised every two years by the U.S. Department of Labor, the Occupational Outlook Handbook includes training and education needed, earnings, expected job prospects, job performance descriptions, and working conditions for numerous jobs.  U.S. Dep't of Labor, Bureau of Labor Statistics, Occupational Outlook Handbook, 2010-11, http://www.bls.gov/oco/ (last visited May 16, 2011).

by an updated MRI scan, chart notes from an October visit with Dr. Sabers, and an evaluation by another treating physician, Dr. Charles Kelly.  Dr. Sabers stated his opinion that Humphrey is "functionally disabled by her discomfort" and described her as unable to walk more than 6-12 blocks, sit for more than two minutes or stand for more than five minutes.  Again, in a 40-minute office visit, 30 minutes were devoted to "counseling and care coordination."  There is no indication that Dr. Sabers performed a physical examination and he did not opine about Humphrey's ability to work with the accommodations suggested by Dr. Parthasarathy.  The MRI scan revealed that the degenerative changes in Humphrey's facet joints had progressed since the last MRI scan of June 2007.

Dr. Kelly described Humphrey as moving "fairly easily," standing upright normally, and easily able to move from a supine position to a sitting position.  Her range of motion was limited by pain in the lower back and a palpation examination revealed tenderness in the lower lumbar area and the right and left sacroiliac joints.  He also noted leg pain.  Dr. Kelly performed several diagnostic tests and reported that Straight Leg Raising tests showed a 10 degree restriction because of tightness in the hamstrings of both legs.  Multiple provocative tests for sacroiliac joint dysfunction were negative.  Humphrey reported almost constant back pain, radiating bilaterally, and rated her current pain a 9 out of 10.  She reported a standing tolerance of only 5 minutes at a time.  The report makes no comment about her sitting tolerance.  Dr. Kelly indicated that Humphrey was treating with 800 milligrams of ibuprofen daily and approximately one Vicodin per week.

Dr. Kelly diagnosed Humphrey as suffering from mechanical lower back pain, lumbar degenerative disc changes, lumbar spondylosis/arthritis changes, and deconditioning syndrome. Dr. Kelly noted that the radiographic diagnoses may not be the actual cause of the pain and that

determining the etiology of Humphrey's pain would be difficult.  For this reason, he did not feel

that fusion surgery was a viable option.  The report does not indicate if Dr. Kelly reviewed Dr.

Parthasarathy's report, and Dr. Kelly did not state an opinion on Humphrey's ability to work in a

sedentary capacity, with or without accommodation.  Dr. Kelly suggested a program of

rehabilitation and noted a good prognosis for recovery of normal functioning if she were able to

strengthen her spine.

Prudential denied Humphrey's second appeal on December 18, 2008.  The denial relied

significantly on a review of Humphrey's recent submissions by Dr. Parthasarathy.  He noted that

the October MRI scan demonstrated increased inflammation, facet and degenerative changes in

L4-L5 and L5-S1, discogenic bulges without herniation at L4-L5 and L5-S1, and L4-L5

spondylolisthesis.  After acknowledging Humphrey's complaints of "chronic, severe back and

leg pain" as well as the "prominent degenerative findings on [the] Lumbar MRI," Dr.

Parthasarathy reiterated his view that "there is no significant medical documentation that would

medically contraindicate" Humphrey's ability to work with the accommodations he previously

identified.  He noted that Dr. Kelly described Humphrey as moving with relative ease and

deconditioned due to her own self-limitation on activity.  In Dr. Parthasarathy's view,

Humphrey's level of perceived impairment is not readily explained by objective examination

findings.  The appeal denial indicated that the decision was final and could not be appealed.

In September 2009, Humphrey's counsel contacted Prudential regarding a third appeal.

Prudential responded that Humphrey had exhausted the administrative remedies allowed by the

Plan.  This lawsuit followed.

## II.      DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed" must support the assertion by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.      Termination of Benefits

#### 1.      Standard of Review

A participant in an ERISA plan may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Typically, a court reviews de novo a denial of benefits challenged under that section. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, when a plan gives discretionary authority to the plan administrator or reviewing committee to determine eligibility for benefits or to construe the terms of the plan, a court reviews the decision to deny benefits for an abuse of discretion. *Id.*

Humphrey argues that Prudential's decision to deny her benefits should be reviewed de novo because only the summary plan description (SPD) contains language conferring discretion.

The Court does not agree.  The Plan defines disability as "when Prudential determines that you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury."  The Plan also states that Prudential will stop sending payments to claimants when "you fail to submit proof of continuing disability satisfactory to Prudential."  This language—"when Prudential determines" and "satisfactory to Prudential"—is sufficient to confer discretion on Prudential.  *See Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 806 (8th Cir. 2002); *Clapp v. Citibank, N.A. Disability Plan (501)*, 262 F.3d 820, 827 (8th Cir. 2001) (defining disability as "a mental or physical condition which the Claims Administrator/Fiduciary determines" confers discretion); *Walke v. Grp. Long Term Disability Ins.*, 256 F.3d 835, 839-40 (8th Cir. 2001) (requiring proof "satisfactory to us" would confer discretion); *Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 620-21 (8th Cir. 1992).

Humphrey argues that the Plan does not confer discretion because the Eighth Circuit Court of Appeals determined in *Ringwald v. Prudential Insurance Company of America*, 609 F.3d 946 (8th Cir. 2010), that a "nearly identical" plan did not confer discretion.  The defendant in *Ringwald* appears to have argued that its discretionary authority came from the SPD alone, a point that the Eighth Circuit rejected.  609 F.3d at 948-49.  In so deciding, however, the Eighth Circuit made no comment on the language in the plan itself.  Although the plan documents at issue in *Ringwald* were before the Eighth Circuit, neither the appellate nor the district court commented on or assessed the plan documents.  Humphrey's reliance on *Ringwald* is, therefore, not persuasive.  Because the plan documents themselves—not just the SPD—contain discretion-conferring language, the Court reviews Prudential's decision for an abuse of discretion.

When reviewing for abuse of discretion, a court will reverse a plan administrator's decision only if it is "arbitrary and capricious."  *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d

696, 701 (8th Cir. 2008). As long as the plan administrator provides a "reasonable explanation for its decision, supported by substantial evidence," it should be upheld. *Ratliff v. Jefferson Pilot Fin. Ins. Co.*, 489 F.3d 343, 348 (8th Cir. 2007). In conducting the review, a court focuses on whether a "reasonable person *could* have reached a similar decision . . . not that a reasonable person *would* have reached that decision." *Phillips-Foster v. UNUM Life Ins. Co. of Am.*, 302 F.3d 785, 794 (8th Cir. 2002) (internal quotation marks omitted).

In this case, Prudential, as a claims administrator who both evaluates and pays benefits, has a conflict of interest that should be considered when evaluating its decision to deny benefits. *See Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 953-54 (8th Cir. 2010) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)). Even where a conflict of this type exists, the standard remains abuse of discretion, not de novo. *Id.* A conflict of interest alone is insufficient to find that an administrator abused its discretion in denying benefits, but it is one of several factors to consider and "may serve as a tiebreaker if the other factors are closely balanced." *Glenn*, 554 U.S at 117. The Court does not identify any factors, and Humphrey has not suggested any, that would cause Prudential's conflict of interest to act as a tiebreaker and result in a finding that Prudential abused its discretion in its consideration of Humphrey's claim. *See Khoury*, 615 F.3d at 945. Accordingly, the Court will consider the conflict in reviewing the record, but the existence of the conflict alone will not be determinative. *Id.*

2.     Supplementing the Record

Humphrey urges the Court to consider evidence outside of the administrative record and unavailable to Prudential at the time of its decision to terminate Humphrey's benefits. Specifically, Humphrey seeks the admission of a favorable decision by the Social Security Administration, made in February 2010, and supporting medical reports, the earliest of which

was produced in July 2009.  Humphrey's arguments in favor of submission presuppose that the

Court will engage in de novo review.  At oral argument, Humphrey conceded that if the Court

reviewed for abuse of discretion, the consideration of additional evidence would not be

warranted.  The Eighth Circuit has recognized that "additional evidence gathering is ruled out on

deferential review, and discouraged on de novo review to 'ensure expeditious judicial review of

ERISA benefits decisions and to keep district courts from becoming substitute plan

administrators.'"  *Brown v. Seitz Foods Inc. Disability Benefit Plan*, 140 F.3d 1198, 1200 (8th

Cir. 1998)(quoting *Cash v. Wal-Mart Grp. Health Plan*, 107 F.3d 637, 641-42 (8th Cir. 1997));

*see also Willcox v. Liberty Life Assurance Co. of Boston*, 552 F.3d 693, 698 (8th Cir. 2009)

("[R]eview under the deferential standard is limited to evidence that was before the

administrator.").

    Even if de novo review applied, Humphrey has failed to show "good cause" to admit

evidence from outside of the administrative record.  In determining whether good cause exists,

the Eighth Circuit Court of Appeals has focused in large part on whether the claimant had an

opportunity to present the additional evidence during the administrative proceedings.  *Sloan v.

Hartford Life & Accident Ins. Co.*, 475 F.3d 999, 1004 (8th Cir. 2007).  An opportunity and

failure to present additional evidence show a lack of good cause.  *Id.*  In her brief, Humphrey

lists reasons that allegedly demonstrate "good cause" to expand the administrative record.[9]

---

[9]     At the hearing, Humphrey described the list as one of "procedural irregularities."
Procedural irregularities might be a basis for a court to adopt a less deferential standard of
review.  *See Wrenn v. Principal Life Ins. Co.*, 636 F.3d 921, 925 n.6 (8th Cir. 2011).  Humphrey
provides no source for the proposition that procedural irregularities are a valid reason to expand
the administrative record, nor does she argue that such a change in the standard of review is
appropriate here.  Even if Humphrey had argued that the alleged "irregularities" should lead to
the application of a higher standard of review, the matters complained of do not indicate a
decision made without reflection and judgment, and are distinct from those that trigger a less
deferential standard of review.  *See, e.g.*, *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 838

Nothing in the list supports a finding that Humphrey was denied the opportunity to present additional evidence.[10]  The record reflects that Prudential reviewed her submissions and communicated with her about the status of her administrative review.  Humphrey was given, and took appropriate advantage of, ample opportunity to submit additional documentation during the administrative appeal process.  The Court declines to consider the supplemental documents.  *See Rittenhouse v. UnitedHealth Grp. Long Term Disability Ins. Plan*, 476 F.3d 626, 631-32 (8th Cir. 2007); *Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 975 (8th Cir. 2003).

       3.      Review of Prudential's Decision to Terminate Humphrey's Benefits

Prudential contends that it is entitled to summary judgment because its decision to terminate Humphrey's benefits was reasonable and supported by substantial evidence. Prudential terminated Humphrey's LTD benefits because it determined that she was able to perform the material and substantial duties of her regular occupation and was not disabled under the Plan.  Prudential supports its decision with Dr. Hadley's IME, Dr. Parthasarathy's reviews, and the vocational review by Grunden.  Additionally, Prudential argues that the reports of Humphrey's treating physicians, Dr. Sabers and Dr. Kelly, also support its decision.  In response, Humphrey analyzes her claim under the de novo standard and argues that the record "proves by a preponderance of evidence" that she was disabled within the meaning of the Plan.  As has

---

(8th Cir. 2006); *Harden v. Am. Express Fin. Corp.*, 384 F.3d 498, 500 (8th Cir. 2004) (per curiam).

[10]     Of the seven listed reasons, only one suggests that Humphrey was somehow denied an opportunity to submit information to the administrative record.  Humphrey argues that her favorable social security determination would have been obtained significantly earlier if Allsup, Inc., the company representing Humphrey in connection with her social security claim, had continued to represent her after Prudential denied her claim.  The conclusion that Allsup's continued representation would have resulted in a favorable determination before the conclusion of Prudential's administrative review is speculative at best.  Moreover, disability determinations by the Social Security Administration are not binding on a determination of benefit eligibility "even when the plan's definition of disabled is similar to the definition the SSA applied." *Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 975 (8th Cir. 2003).

already been explained, because the Plan confers discretion, the appropriate inquiry is whether Prudential's decision was reasonable and supported by substantial evidence.

Humphrey correctly points out that there is abundant objective evidence that she suffered from degenerative disc disease and severe back pain. Prudential does not dispute that Humphrey suffered from degenerative disc disease. The denial arose from its determination that Humphrey's consequential limitations—her inability to sit or stand for prolonged periods due to pain—did not prevent her from performing the material and substantial duties of a senior administrative assistant. Prudential determined that Humphrey, in spite of her reportedly high levels of pain, was capable of working as a senior administrative assistant. As explained below, that determination was reasonable in that it was supported by substantial evidence.

Prudential's initial denial relied heavily on Dr. Hadley's conclusions, as well as a finding that Dr. Hadley's report showed improvement in Humphrey's ability to walk when compared with earlier records. During his examination, Dr. Hadley observed that Humphrey seemed reluctant to sit but that she was able to stand erect, had no list or tilt, was able to walk on her heels and toes, was able to squat and touch the floor between her knees, and was able to reverse her lumbar lordosis. In addition to the physical examination he performed, Dr. Hadley had before him a medical history that showed abatement and recurrences of pain in varying degrees; medical opinions that fusion surgery could help but that Humphrey had refused it; and a period when a change of climate led to marked improvement, followed by a return of pain which she believed occurred because of a return to Minnesota.

Dr. Hadley concluded that his examination did not support restrictions on sitting, standing, walking, lifting, carrying, pushing, pulling, or reaching; and that Humphrey had not shown objective limitation of motion of the lumbar spine, had a normal physical examination,

and no neurologic deficits.  Dr. Hadley observed that further diagnostic and therapeutic steps

could be taken and might reveal information that could be instructive on points outside of the

focus of his examination—the magnitude of disability caused by degenerative disc disease, to

wit:  discography to document the discogenic nature of her pain, and behavioral therapy as a

means of treating her symptoms.  And while Dr. Hadley indicated that Humphrey "demonstrated

no manifestations of symptom magnification or other underlying psychological factors," he also

observed that she had not been evaluated for psychological manifestations.  While a discography

was not medically necessary, given Humphrey's disinterest in surgery, Dr. Hadley indicated that

it could have aided in the insurance investigation to document the nature of her pain.  Dr. Hadley

concluded that pain management appeared to have been maximized, though he noted the

potential for behavioral therapy and a psychological evaluation.

  Dr. Hadley also articulated the bounds of his ability to determine the durational limits on

Humphrey's ability to sit or stand by explaining that such limits were "entirely subjective" and

that there is "no way of accurately determining them."  There is no dispute that objective

evidence indicated Humphrey suffers from degenerative disc disease.  Dr. Hadley explained

what he was able to observe—the ease with which she walked, her ability to squat and touch the

floor, a lack of tenderness and spasms in her lower back—and made clear that though his

examination did not support restrictions on sitting or standing, this did not mean he could

accurately determine Humphrey's subjective limitations on sitting and standing.  The record

indicates that Prudential, as well as the reviewing physicians, took seriously the evidence of

Humphrey's disc degeneration and capacity concerns, as well as her complaints of pain.

Prudential reviewed the examination findings of Dr. Hadley and concluded that although the

records showed impairment, the impairment was not so severe that Humphrey could not work in

her regular occupation as a senior administrative assistant.  Dr. Hadley's report provided

substantial evidence on which to base a termination of benefits and Prudential acted reasonably

in relying on the report.  *See Dillard's Inc. v. Liberty Life Assurance Co. of Boston*, 456 F.3d

894, 900 (8th Cir. 2006); *Hunt v. Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005) (finding

no abuse of discretion where termination based on opinion of reviewing doctor who finds no

disability because, though he agrees with diagnosis of treating doctor, he questions "the effect"

of the diagnosis on patient's capabilities); *see also Dorholt v. Hartford Life and Accident Ins.

Co.*, 244 F. App'x 66, 68 (8th Cir. 2006).

Viewing the record as a whole, there is substantial evidence to support Prudential's

determination that Humphrey was not disabled under the Plan.  While Dr. Sabers's opinion that

Humphrey is "considered disabled from extended sitting in [her] previous occupation," supports

her claim, the evaluations of both Dr. Hadley, the independent medical examiner, and Dr.

Parthasarathy, the reviewing physician, support a finding that Humphrey was not disabled such

that she qualified for LTD benefits.  The Court concludes that it was not an abuse of discretion to

credit these evaluations.  *See Weidner v. Fed. Express. Corp.*, 492 F.3d 925, 930 (8th Cir. 2007);

*Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 875 (8th Cir. 2006); *see also Delta Family-Care

Disability & Survivorship Plan v. Marshall*, 258 F.3d 834, 842 (8th Cir. 2001) (treating

physician's opinion not automatically controlling because the record must be evaluated as a

whole).

Humphrey contends that Dr. Hadley's report cannot provide substantial evidence because

it resulted in "conflicting conclusions."  According to Humphrey, Dr. Hadley's finding that there

were "no examination findings to support restrictions with sitting, standing, walking, lifting,

carrying, pushing, pulling, or reaching" is at odds with his statement that Humphrey's reported

19

pain associated with prolonged sitting or standing is "consistent with the radiographical diagnosis." But the observations are not incompatible. Humphrey's argument assumes that degenerative disc disease necessarily precludes working as a senior administrative assistant. In fact, disc degeneration can lead to a continuum of disabilities. Dr. Hadley was not attempting to determine whether Humphrey had some disability or some capacity, but where on the continuum she fell and whether she was sufficiently incapacitated to be considered disabled under the Plan. Dr. Hadley's finding that the MRI scans are "consistent" with Humphrey's complaints does not conflict with his finding that restrictions on standing and sitting were not supported by his examination.

Humphrey also argues that "there was no suggestion" that KPMG would accommodate the restrictions outlined in Dr. Parthasarathy's report. In support of this argument, she points to a November 20, 2006, note from Prudential Claim Manager Nicole Jackson stating that KPMG did not consider Humphrey's job sedentary because there are "some physical abilities to the position"; that KPMG was unsure whether they will be able to accommodate Humphrey; and that KPMG was still searching for the job description. The accommodations at issue in November 2006, were not those proposed by Dr. Parthasarathy but those temporarily approved by Dr. Sabers: 4 hours of "very light" duty work per day for two weeks, followed by a return to work. Also, by the time of Dr. Parthasarathy and Grunden's reports, KPMG had located a job description and provided it to Prudential. Prudential's Vocational Rehabilitation Specialist considered the description provided by KPMG, along with other standardized sources, in her determination that Humphrey's occupation was sedentary. Moreover, the relevant inquiry of disability under the Plan was not whether KPMG would rehire or accommodate Humphrey but whether Humphrey would be able to perform the material and substantial duties of a senior

administrative assistant as "normally performed."  The Plan explicitly indicates that the

determination is to be based on how the occupation "is normally performed instead of how the

work tasks are performed for a specific employer at a specific location."  It was reasonable for

Prudential to interpret the Plan to require consideration of Humphrey's generic occupation,

rather than her job as it was performed at KPMG.  *See Darvell v. Life Ins. Co. of N. Am.*, 597

F.3d 929, 936 (8th Cir. 2010) (finding it reasonable to interpret the phrase "material duties of his

. . . regular occupation" as a reference to a generic occupation, rather than a specific position).[11]

Humphrey makes several other unpersuasive arguments about Dr. Parthasarathy's

findings.  Humphrey argues that Dr. Parthasarathy's review supports a finding that she was

disabled within the meaning of the Plan and that the Court should discount his perspective

because he did not physically examine Humphrey.  The Court rejects both of these arguments.

While Dr. Parthasarathy noted that Humphrey was functionally impaired, this Court has already

explained that this does not amount to a finding that Humphrey was disabled within the meaning

of the Plan.  Further, Humphrey's argument that his perspective should be discounted simply

because he did not physically examine Humphrey is inappropriate.  *See Midgett v. Washington*

*Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir. 2009); *Delta Family-Care*

*Disability and Survivorship Plan*, 258 F.3d at 843.  Humphrey also alleges that Dr. Parthasarathy

reviewed Humphrey's documents for a second time because Prudential was displeased with his

first review.  The record provides no indication that Prudential was "displeased" with the

---

[11]     For the same reasons, the Court is not persuaded by Humphrey's reliance on her April 2,
2007, letter to Prudential stating that KPMG would not accommodate her restriction to "very
light" duties recommended by Dr. Sabers.  At that time, Dr. Sabers had indicated that Humphrey
could work under "current restrictions"—2 hours of light-duty work per day.  An August 26,
2008, letter from Humphrey to Prudential states that KPMG required her to work "full time" and
explains that this is why she did not return to work in January 2007.

outcome of his review, especially given Prudential's significant reliance on his findings in its

denial of Humphrey's first and second appeal.

At oral argument, Humphrey argued there was no substantial change in the administrative

record on which Prudential could have based its decision to terminate Humphrey's benefits.  The

Eighth Circuit has recognized that the payment of benefits does not operate "forever as an

estoppel so that an insurer can never change its mind; but unless information available to an

insurer alters in some significant way, the previous payment of benefits is a circumstance that

must weigh against the propriety of an insurer's decision to discontinue those payments."

*McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002); *see also Morgan v.*

*UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1177-78 (8th Cir. 2003); *Walke*, 256 F.3d at 840-41.

There was a significant change in information available in the administrative record between

Prudential's last determination that LTD benefits should be continued on July 19, 2007, and its

denial of Humphrey's claim on June 16, 2008.  Indeed, after July 19, 2007, the following

additions were made to the administrative record: the report by Dr. Mehbod, indicating a normal

gait; a review of this report by Nurse DeSantis noting that Humphrey was not treating with

expected pain medications or modalities; a review by a physical therapist employed by

Prudential who opined that, based on recent records from Dr. Sabers and Dr. Mehbod, Humphrey

may be able to do part-time work with certain restrictions; and a medical examination by an

independent, board-certified orthopedic surgeon whose examination did not support restrictions

on sitting or standing.  *See Dillard's Inc.*, 456 F.3d at 900 (determination by reviewing physician

that plaintiff not disabled and could return to work is "significant change in information

available" to claims administrator); *Hunt*, 425 F.3d at 491.[12]  After the initial denial, Prudential

hired an independent doctor who is board certified in rehabilitation and pain medicine, Dr.

Parthasarathy.  Dr. Parthasarathy did not blindly adopt the opinions of Dr. Hadley but rather

opined that Humphrey could work in a sedentary job but, because of pain and impairment, she

would require specific accommodations.   After Dr. Parthasarathy's review, a vocational

rehabilitation specialist reviewed the accommodations, as well as the physical and professional

requirements of Humphrey's occupation, and determined that Humphrey was able to work in her

occupation.  Because Prudential does not dispute the existence of Humphrey's impairment and

instead disputes whether it renders her disabled under the Plan, the Court finds that these new

opinions on the issue of Humphrey's capacity were a significant change in the record before

Prudential.

**B.      Breach of Fiduciary Duty**

Humphrey claims that Prudential breached its fiduciary duties under ERISA by failing to

provide a copy of the SPD, with all modifications and changes, within 90 days of her

participation in the plan, or by failing to provide her with a summary of any modifications within

210 days of the end of the Plan year, as required by 29 U.S.C. § 1024(b)(1).  (Compl. ¶¶ 34-37)

Humphrey claims that, as a result of this failure, she was denied an opportunity to submit a third

appeal.  (Compl. ¶¶ 47-48)  When Humphrey began working at KPMG in July 2005, she was

provided with an SPD that provided three levels of administrative appeals.  Each of Prudential's

claim determination letters states that the Plan includes two levels of appeal.  (Tamika Johnson

Decl. at D0486, D0488, D0492, D0502, D0512, D0545, D0572)  Humphrey submitted her third

---

[12]      Humphrey also argues that evidence that she underwent spinal surgery with Dr. Mehbod
in 2009 proves her disability under the Plan.  The Court has already concluded that this evidence
is not within the administrative record and the Court does not consider it.

appeal on September 15, 2009—well outside of the 180-day period for a third appeal under the older version of the Plan.  Prudential responded by explaining that Humphrey's file had been closed and that she had exhausted her administrative remedies under the Plan.  In later correspondence with Humphrey's counsel, Prudential explained that, effective January 1, 2005, the Plan had been amended to provide for only two levels of appeal.  Humphrey does not dispute that the Plan was amended but claims she was never provided with a new, updated, or amended version of the Plan.

First, Humphrey contends that Prudential breached its fiduciary duty when Humphrey was given an outdated SPD.  This claim fails because "[t]he Summary Plan Description unambiguously identifies [KPMG] as the Plan Administrator.  [Prudential] . . . had control over claims under the policy, but assuming that function did not transform it into the Plan Administrator.  ERISA specifically makes the Plan Administrator responsible for providing the Plan documents" that Humphrey alleges were improperly furnished.  *Ross v. Rail Am. Grp. Disability Income Plan*, 285 F.3d 735, 743 (8th Cir. 2002) (citing 29 U.S.C. § 1024(b)); *see also LaSalle v. Mercantile Bancorporation, Inc. Long Term Disability Plan*, 498 F.3d 805, 810 n. 2 (8th Cir. 2007) (stating that § 1024(b)(4), by its terms, places obligations on the plan administrator, not the claims administrator).

Second, Humphrey contends that any amendment to the Plan was a breach of fiduciary duty because the Plan did not include proper amendment procedures.[13]  The Court doubts that the

---

[13]     Humphrey's sole support for this proposition— the Eighth Circuit's statement in *Ringwald* that the plan there at issue "wholly fails" to include an amendment procedure—is unpersuasive.  Humphrey asserts that the plan in *Ringwald* is "virtually identical" to the Plan now before the Court.  While the plan documents before the district court in *Ringwald* appear similar, the *Ringwald* record does not include a copy of the group contract, and the circuit court in *Ringwald* did not discuss whether the group contract contained amendment procedures. *Ringwald*, 609 F.3d 946 at 949.  Here, the group contract, under the General Rules heading,

Complaint adequately pled this claim.  The Complaint did not mention a failure to include amendment procedures or to properly amend the Plan.  Moreover, the Complaint specifically stated that Humphrey's breach of fiduciary duty claim is based on a breach of § 1024(b)(1); a claim based on the failure to include proper amendment procedures would be based on a violation of 29 U.S.C. § 1102(b)(3).  *See Ringwald*, 609 F.3d 946 at 949; *see also See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).  Nonetheless, even if properly pled and assumed accurate, these facts do not support a finding that Prudential breached its fiduciary duty to Humphrey.  A claims administrator does not act as a fiduciary when it amends a plan.  *See Ross*, 285 F.3d at 740 n.6 (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 889-90 (1996)).

Finally, Humphrey argues that Prudential breached its fiduciary duty by wrongfully informing her that she was due only two appeals.  This argument ignores the fact that the Plan in effect at the time Humphrey became disabled did allow for only two appeals, a fact that Humphrey does not challenge.  Prudential submitted a copy of the Group Contract, LTD Booklet-Certificate, and the SPD providing LTD benefits for qualifying employees at KPMG, effective January 2006, which reflects that the Plan allowed two appeals.  (Decl. Coppola ¶ 5, D0596)  Humphrey does not challenge the validity of the documents or dispute that, together, they form the plan in effect and controlling, as of January 2006.  Neither does Humphrey challenge that she was informed throughout the administrative process that she had only two appeals.  Effectively, Humphrey only argues that she was initially provided an SPD indicating that she had three appeals and that she never received notification of the amendment.  These facts, even if true, do not support a finding that Prudential breached a fiduciary duty.

---

section I, includes an amendment procedure.  *Cf. Curtiss-Wright*, 514 U.S. at 80-82 (describing adequate amendment procedures).

Under ERISA, there is a presumption against vesting of benefits; ERISA itself does not create any substantive entitlements to employer-provided health benefits or other kinds of welfare benefits.  *See Curtiss-Wright*, 514 U.S. at 78.  Thus, many circuit courts have held that unless language in the plan establishes some ambiguity on the issue, an employer is at liberty to change the plan, and thus the benefits, to which a participant is entitled until such time as a claim accrues.  *See, e.g.*, *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003).  These circuits have found that where a plan is changed, the plan in effect at the time benefits were denied is controlling.  *See, e.g.*, *id.*  ("[A]bsent ambiguity on the vesting question, the controlling plan must be the plan in effect at the time the benefits were denied."); *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Empl. Health & Welfare Plan*, 298 F.3d 191, 196-97 (3d Cir. 2002) (same); *Hall v. Nat'l Gypsum*, 105 F.3d 225, 230 (5th Cir. 1997) (same). *But see Gibbs ex rel. Estate of Gibbs v. CIGNA*, 440 F.3d 571 (2d Cir. 2006) (absent explicit language in the plan, disability welfare benefits vest no later than the time the employee becomes disabled).  The Plan states that the "Group Contract may be amended, at any time, without the consent of the Insured Employees or anyone else with a beneficial interest in it. . . . But an amendment will not affect a claim incurred before the date of change."  (Coppola Decl., D0590) For any amendment to affect Humphrey's claim it must have been made before she incurred her claim.  Because the plan submitted by Prudential was effective as of January 1, 2006, and Humphrey did not become disabled until June 20, 2006, the two-appeal plan, rather than the one Humphrey received at the time of her enrollment, was controlling.  In fact, the two-appeal plan was in effect both at the time of disability and denial.  The Court concludes that the plan controlling Humphrey's claim provided for two levels of appeal and Prudential accurately communicated this to Humphrey.

### III.   CONCLUSION

There is substantial evidence in the record that even with the pain associated with her degenerative disc disease, Humphrey would be able to perform the material and substantial duties of her regular occupation.  Under the deferential standard of review appropriate in this case, the Court concludes that Prudential's decision to deny Humphrey LTD benefits must be upheld.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      Prudential Insurance Company of America's motion for summary judgment [Docket No. 14] is GRANTED.

2.      This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  May 24, 2011

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

27